**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-3618
_____

I n  re: Otter Tail Power Company,                              *

                                                               *

          Petitioner.           *

_____

                                      Petition  and  Appeal  from
the
     No. 96-3637                      United    States   District
Court
     _____                      for  the  District  of  North
Dakota.

Baker Electric, a North Dakota Rural                           *
Electric Cooperative Association,                              *
                                      *
          Appellee,             *
                                      *
     v.                         *
                                      *
Otter Tail Power Company,       *
                                      *
          Appellant.            *
                      _____

          Submitted:  January 14, 1997
                                                    Filed:
 June 23, 1997
                      _____

Before McMILLIAN, WOLLMAN, and MAGILL,[1] Circuit Judges.
                      _____

_____

     [1]The Honorable Frank J. Magill was an active judge at the time this case was
submitted and assumed senior status on April 1, 1997, before the opinion was filed.

MAGILL, Circuit Judge.

The Baker Electric Cooperative, Inc. (Baker) brought this suit for injunctive relief and damages against the Otter Tail Power Company (Otter Tail) in the North Dakota state court to prevent Otter Tail from providing electricity to property on trust land on the Fort Totten Indian Reservation in North Dakota. Otter Tail removed the case to the United States District Court for the District of North Dakota. Subsequently, the district court remanded the matter back to the North Dakota state court, concluding that the district court lacked subject matter jurisdiction. Otter Tail now appeals, and we reverse.

## I.

The Spirit Lake Sioux Tribe[2] (Tribe) is a federally recognized Indian Tribe which occupies the Fort Totten Reservation (Reservation). The Reservation, created by treaty in 1867, see Treaty with the Sioux-Sisseton and Wahpeton Bands, 15 Stat. 505 (1867), consists of 245,141 acres located within Ramsey, Eddy, Nelson, and Benson counties of North Dakota. Approximately three-fourths of the reservation is held in fee by non-tribal members, while approximately 63,000 acres are either held in trust for the Tribe by the United States, owned by the Tribe in fee simple, or owned by tribal members in fee simple. See Devils Lake Sioux Indian Tribe v. North Dakota Pub. Serv. Comm'n, 896 F. Supp. 955, 958 (D.N.D. 1995) (Devils Lake).

---

[2]The Spirit Lake Sioux Tribe was previously known as the Devils Lake Sioux Tribe.

Electricity consumers on the Reservation have received electrical services from three utilities companies: (1) Otter Tail, an investor-owned Minnesota corporation; (2) Baker, a North Dakota cooperative; and (3) Sheyenne Valley Electric Cooperative, Inc., also a North Dakota cooperative. Controversy arose between Otter Tail and the two cooperative utility companies in 1988 when the Tribe asked Otter Tail to provide

electricity to Dakota Tribal Industries (DTI), a tribally owned business located on trust land within the Reservation.

The North Dakota Public Service Commission (NDPSC) is a state administrative body which regulates investor-owned electric utilities in North Dakota. Pursuant to North Dakota statute, NDCC 49-03.1, investor-owned utilities must obtain a Certificate of Public Convenience and Necessity (Certificate) from the NDPSC prior to the construction, operation, or extension of a public utility system. The NDPSC asserted that it had jurisdiction to regulate the provision of electricity on the Reservation, and Otter Tail attempted to obtain a Certificate from the NDPSC allowing Otter Tail to extend its system to serve DTI. Prior to obtaining a Certificate, however, Otter Tail began providing electricity to DTI.

Baker protested the application for a Certificate, and the NDPSC held a hearing. The NDPSC also issued a show cause order for Otter Tail's alleged contempt in providing electricity without having obtained a Certificate. In response, Otter Tail sought a writ of prohibition in the North Dakota state court against the NDPSC's show cause order, alleging that the NDPSC did not have jurisdiction over the Reservation.

After initial proceedings in the North Dakota state district court, the North Dakota Supreme Court assumed jurisdiction. In Application of Otter Tail Power Co., 451 N.W.2d 95 (N.D. 1990), the North Dakota Supreme Court reached two alternative holdings. First, because the Tribe was not a party to the proceedings, the court held

that Otter Tail did not have standing to argue that the NDPSC's assertion of jurisdiction over the Reservation would impair tribal sovereignty. See id. at 97-98. Second, the court held that, assuming that Otter Tail did have standing to pursue this argument, the NDPSC nevertheless had regulatory jurisdiction over the entire Reservation. See id. at 98. Accordingly, the NDPSC was allowed to continue its contempt proceeding against Otter Tail. See id. at 107.

Contrary to the North Dakota Supreme Court's decision that the NDPSC had jurisdiction to regulate electrical services on the Reservation, in July 1990 the Tribe promulgated its own regulations, asserting that the Tribe had exclusive authority to regulate electrical services on the Reservation. See Baker Elec. Coop., Inc. v. Chaske, 28 F.3d 1466, 1470 (8th Cir. 1994) (Baker). Disregarding these tribal regulations, in August 1990 the NDPSC ordered Otter Tail to stop servicing DTI. Both the Tribe and Otter Tail brought suit against the NDPSC to enjoin the state agency from interfering with the Tribe's relationship with Otter Tail. See id.

The district court dismissed Otter Tail's suit on res judicata grounds, finding that the North Dakota Supreme Court's decision in Application of Otter Tail Power Co. controlled Otter Tail's claims for relief. We reversed. See Baker, 28 F.3d at 1475-76. On remand, we provided extensive directions to the district court:

> We remand with instructions that the district court make detailed factual determinations and set out its analysis in support of its legal determinations. On remand, the district court should consider the factors set out in Montana v. United States, 450 U.S. 544 (1981), and its progeny, to settle the core issue in this dispute: whether the Tribe has the sovereign authority to regulate electric services on the Reservation, and whether the Tribe's authority preempts that of NDPSC. The district court should determine: first, whether Congress has granted the Tribe the authority to regulate electric services through the 1867 Treaty or through subsequent congressional legislation; second, if Congress has granted the Tribe

regulatory authority over electric services, whether Congress later has abrogated that regulatory authority; third, if Congress has abrogated the Tribe's express regulatory authority over electric services, whether the Tribe retains inherent authority to regulate electric services on the Reservation; fourth, and finally, if the Tribe retains regulatory authority over electric services, whether that authority preempts NDPSC's authority.

Id. at 1476 (footnote omitted).  See also id. at 1476-78 (detailing analysis to be conducted on remand by the district court).

On remand, the district court held that the Tribe did not have the exclusive authority to regulate the provision of electrical services on the Reservation.  See Devils Lake, 896 F. Supp. at 961 ("The facts of this case present no justification for the [Tribe's] exercise of regulatory authority over the provision of electrical service within the exterior boundaries of the reservation.  No showing has been made, and by inference at least, can be made, that the health, welfare or safety of any Tribal Member is in any way threatened under the present system." (footnote omitted)).  The district court also held, however, "that where the service sought is to a Tribal business located upon Trust land, the necessary nexus between Tribal Interests and inherent sovereignty is present."  Id.  The district court specifically ordered:

> 1.  That Otter Tail is entitled to summary judgment on the issues between it and the North Dakota Public Service Commission, to the effect that the Tribe may by resolution or contract determine who is to supply electrical service to Tribal owned businesses located upon Indian owned or trust lands, without regard to the rate structure or other regulations of the North Dakota Public Service Commission, and the Public Service Commission is restrained from any sanctions against Otter Tail, or any future competitor, for providing such service.  Nothing herein shall limit the power or authority of the North Dakota Public Service Commission except as to such service, present or future.

2.    That  the  North  Dakota  Public  Service Commission and utility parties are entitled to judgment  on  the  issue  of  the  authority  of  the Tribe to regulate the distribution of electrical service  within  the  exterior  boundaries  of  the reservation,  except  as  specifically  provided above.    The  promulgation  and  enforcement  of  a reservation  wide  utility  regulation  scheme, without regard to land ownership, occupancy or use  is  beyond  the  sovereign  authority  of  the tribe--under the fact specific situation present here.

Id. at 961-62 (emphasis added).

Neither party appealed this decision. The Tribe did, however, move the district court to modify its order. In a subsequent order, filed April 3, 1995, the district court denied this motion, stating:

Plaintiff's counsel has moved for a modification of the judgment entered in this file. The court granted summary judgment, recognizing the sovereign authority of the Tribe in certain limited situations where the ownership and control of land coincided with the operation of a tribal business or governmental service.

In the motion, plaintiff asked that the court extend the recognition of sovereign power to authorize the Tribe to regulate the provision of public utility type services to any usage by a tribal member upon tribally owned or trust lands. Although a logical extension of the basis enunciated in the initial decision, the broadening of the power to regulate to cover individual tribal members living on trust land goes beyond what the court views as the necessary prerogative of sovereignty.

Order (Apr. 3, 1995) at 1-2, reprinted in Appellant's App. at 36-37.

In the Fall of 1995, following the entrance of the district court's orders, the Tribe asked Otter Tail to provide electricity to several additional sites on trust land. The Tribal Housing Authority (THA), a tribal governmental agency which provides housing assistance, requested Otter Tail to service certain accounts managed

-11-

or underwritten by the THA.  These include the home of Ms. Vivian Spotted Horse, a disabled tribal member who has received extensive financial assistance from the THA in moving, renovating, and heating her home.

In addition, the Tribe asked the Bureau of Indian Affairs (BIA) to contract with Otter Tail to provide electricity to the Four Winds School (School), a pre-kindergarten

through twelfth grade primary and secondary education institution built on trust lands. The buildings of the school are owned by the BIA, which manages the School's physical plant and leases the School to the Tribal school board. The Tribal school board, which is a tribal governmental agency, establishes the curricula for the lower grades of the School. The School's ninth through twelfth grade curricula are established by North Dakota Independent School District No. 30 (ISD 30), a political subdivision of the State of North Dakota. ISD 30 subleases part of the School from the Tribal school district and operates a public high school on the site.[3]

Baker filed suit against Otter Tail in North Dakota state court in 1996, seeking to enjoin Otter Tail from servicing accounts on the Reservation which were not specifically "tribal owned businesses located upon Indian owned or trust lands." Compl. (Feb. 29, 1996) at 8, ¶ 21 (quotation omitted), reprinted in Appellant's App. at 46. Baker also sought unspecified punitive damages from Otter Tail. See id. Otter Tail removed the case to the district court, and subsequently moved the district court to dismiss the case without prejudice pending tribal court adjudication.

---

[3]On October 23, 1996, the Bureau of Indian Affairs (BIA), pursuant to a contract with the Tribe, agreed to pay $37,500 annually for the provision of electrical services for the School. See Contract (Oct. 23, 1996); reprinted in Appellant's Supp. App. at 5. On November 13, 1996, the Tribe accepted a bid by Otter Tail to subcontract the provision of electrical services for the School. See Spirit Lake Sioux Tribe Resolution No. A05-97-053 (Nov. 13, 1996); reprinted in Appellant's Reply Add. at 1.

The district court denied Otter Tail's motion, but dismissed the case for lack of subject matter jurisdiction. The district court stated:

> Baker Electric is once again threatened by the encroachment of Otter Tail upon the distribution area which Baker considers to be protected by the North Dakota Territorial Integrity law. As in previous proceedings, Otter Tail relies upon permission granted by the Devils

Lake Sioux Tribal Government, arguing that Tribal Sovereignty trumps the jurisdiction of the North Dakota Public Service Commission.

Baker Electric seeks to have the latest foray thwarted through the issuance of injunctive relief, through an order prohibiting Otter Tail from furnishing power to the "Four Winds School" and also to five elderly housing units with individual meters and individual payment responsibilities.

In a previous action, this court attempted to define those tribal activities so essential to the exercise of tribal sovereignty so as to justify the right of the tribe to select a supplier of electrical power in apparent violation of the orders of the [NDPSC]. In [Devils Lake,] that definition was posed as "the operation of tribal owned businesses located upon Indian owned or trust lands." [896 F. Supp. at 961]. That opinion was issued after remand from the circuit court of appeals and was not appealed further.

Otter Tail argues that it must then follow that a school building, owned by the federal government, with primary grades under the control of the Tribal Government and high school grades under the control of a school board organized and elected under North Dakota State Law, with tax assessing authority, located upon trust lands, must fall within the definition set out above. It further contends that any reservation resident receiving tribal housing assistance in any form, living on [I]ndian owned or trust lands, is equally within the sovereign umbrella of Tribal authority.
Otter Tail further argues that the issue should be decided first in Tribal Court and that this court should not exercise jurisdiction

until after Tribal Court has determined the width and breadth of tribal sovereignty. The tribe is not a party to this proceeding and did confer jurisdiction over this issue upon this court in the previous proceeding by suing in this court. Baker claims it is doing nothing more than asking this court to cause enforcement of the previous final judgment.

I see no choice available. Otter Tail may indeed be ultimately correct in the spin which it seeks to impart to the court's definition, and

very probably the protection afforded the cooperatives through the territorial integrity act will soon vanish with the gradual legislative deregulation of the electric generation and distribution industry. At this moment however, the previously articulated definition is the one I must follow, and, as pure dicta, under it Baker is entitled to the protection it seeks.

This court, however, is not the [NDPSC] and has no interest in attempting to usurp the regulatory authority of the [NDPSC]. Application of the territorial integrity law, even with the complications of tribal sovereignty, is the province of the [NDPSC]. I sympathize with Baker's attempt to get the court to enforce the previous ruling, but I do not believe jurisdiction is present.

The application for a preliminary injunction is denied and the action is ordered dismissed for want of subject matter jurisdiction.

Mem. & Order (July 9, 1996) at 1-3, reprinted in Appellant's App. at 113-15.

Baker sought a modification of this order, and Otter Tail requested that the district court explain the basis for its decision. In a subsequent order, the district court modified its July 9 memorandum and order and remanded the case to the North Dakota state court, stating:

This action was originally filed by Baker Electric in state court. Otter Tail Power Company removed the matter to Federal Court. Baker Electric is correct in pointing out that

-17-

the order appears to dismiss the original state court action. This was not the intent of the Court. The arguments of Otter Tail Power have been reviewed. The Court is not persuaded to change its original order and believes the "basis of its decision" is reasonably discernable.

Order (Sept. 5, 1996) at 1-2, reprinted in Appellant's
App. at 138-39.  Otter Tail now appeals.[4]

**II.**

---

[4]In addition to this appeal, Otter Tail has filed with this Court a duplicative petition for a writ of mandamus, praying for the same relief as in Otter Tail's appeal. This Court has recently held that a challenge to a district court's remand of a removed case back to state court on the ground of lack of subject matter jurisdiction is properly raised on appeal.  See Gaming Corp. of America v. Dorsey & Whitney, 88 F.3d 536, 542 (8th Cir. 1996).  Accordingly, we shall consider the merits of Otter Tail's appeal, and we shall dismiss Otter Tail's petition for a writ of mandamus.

We review the district court's remand of a removed case for lack of subject matter jurisdiction de novo. See Gaming Corp. of Am. v. Dorsey & Whitney, 88 F.3d 536, 542 (8th Cir. 1996).[5] Upon review, we conclude that the district court erred in

---

[5]28 U.S.C. § 1447 (1994) limits this Court's jurisdiction over certain remand orders by district courts in removed cases. Section 1447 provides, in relevant part:

(c) A motion to remand the case on the basis of any defect in removal procedure must be made within 30 days after the filing of the notice of removal under section 1446(a). If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded....

(d) An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise, except that an order remanding a case to the State court from which it was removed pursuant to section 1443 of this title shall be reviewable by appeal or otherwise.

Although these provisions appear to limit this Court's jurisdiction in the instant case, we have explained that:

[Section 1447's] broadly stated restriction has been construed narrowly, however, and the Supreme Court has explained that only cases remanded under 28 U.S.C. § 1447(c) are subject to this nonreviewability provision. Quackenbush v. Allstate Insurance Company, 116 S. Ct. 1712, 1718, 1720-21 (1996); Thermtron Products, Inc. v. Hermansdorfer, 423 U.S. 336, 346 (1976).

Gaming Corp., 88 F.3d at 541 (footnote omitted). Because "[t]his case was not remanded under 28 U.S.C. § 1447(c), . . . § 1447(d) does not bar review by an appellate court." Id.

remanding this matter to the state court.

"The propriety of removal to federal court depends on whether the claim comes within the scope of the federal court's subject matter jurisdiction." Peters v. Union Pacific R.R. Co., 80 F.3d 257, 260 (8th Cir. 1996) (citing 28 U.S.C. § 1441(b)). A case is properly removed to the federal court "only if it could have been brought in federal court originally." Id.

The district court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." See 28 U.S.C. § 1331 (1994). A case presenting a federal question is, therefore, properly removable to the district court. See 28 U.S.C. § 1441(b) ("Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties. . . . "). Once a case is properly removed to a district court, the "district court has no discretion to remand a claim that states a federal question." Gaming Corp., 88 F.3d at 542. "The existence of a federal question is an issue of law which we review de novo." Id.

"A federal question is raised in those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right

-21-

to relief necessarily depends on resolution of a substantial question of federal law." Peters, 80 F.3d at 260 (quotations and citation omitted). This well-pleaded complaint rule

> requires that a federal cause of action must be stated on the face of the complaint before the defendant may remove the action based on federal question jurisdiction. A federal defense . . . does not give the defendant the right to remove to federal court.

Gaming Corp., 88 F.3d at 542-43 (citation omitted). However, "[a] plaintiff's characterization of a claim as based solely on state law is not dispositive of whether federal question jurisdiction exists." Peters, 80 F.3d at 260.

In its complaint, Baker challenges Otter Tail's right to supply electrical services to certain tribal operations without the benefit of a Certificate issued by the NDPSC. See Compl. at 8, ¶ 21 (Mar. 4, 1993), reprinted in Appellant's App. at 46. After recounting the history of the litigation surrounding the delivery of electrical services to the Reservation, Baker's complaint specifically references the district court's prior decision in this matter. See id. at 4, ¶ 10, reprinted in Appellant's App. at 42. After providing its interpretation of the district court's prior holding, id. ("The Court ruled that the State's regulatory authority was superseded only in those cases involving the 'supply of electrical service to tribal owned businesses located upon Indian owned or trust lands.'" (citation omitted) (emphasis added)), Baker's complaint alleges that Otter Tail is servicing accounts that "are not 'tribally owned

businesses[,]' but, rather, are accounts directly within the scope" of the NDPSC's authority.  Id. at 6, ¶ 17, reprinted in Appellant's App. at 44 (emphasis in original).  Baker's request for injunctive relief is specifically premised on this alleged deviation by Otter Tail from the terms of the district court's previous order.  See id. at 8, ¶ 21, reprinted in Appellant's App. at 21.

To understand Baker's complaint, therefore, it is necessary to examine the district court's prior order. In reaching the holding upon which Baker relies, the district court,

pursuant to this Court's directive, explicitly analyzed the effects of a United States treaty, various federal statutes, and the federal common law of inherent tribal sovereignty on the existence and extent of the Tribe's authority, and the NDPSC's authority to regulate the provision of electrical services on the Reservation. See Devils Lake, 896 F. Supp. at 960-61. The district court ultimately held that, while the Tribe did not have the authority to regulate all of the electrical service provisions on the Reservation, neither was the Tribe wholly without regulatory authority. See id. at 961. Conversely, the district court held that the NDPSC had some regulatory authority over the Reservation, but that its authority was not complete. Id. In reaching these conclusions, the district court noted that its attempt "to draw the line between permissible and non-permissible exercises of Tribal powers . . . is somewhat of a philosophical exercise." Id. Baker's instant complaint, which "is nothing more than an action to enforce [the district court's] prior judgment in Devils Lake Sioux Tribe v. North Dakota Public Service Commission, 896 F. Supp. [955] ([D.]N.D. 1995)," Baker Br. in Opp'n to Mot. to Dismiss at 2 (May 3, 1996), reprinted in Appellant's App. at 101, is therefore an attempt to more precisely "draw the line" of Tribal regulatory authority.

Because "'tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States,'" Baker, 28 F.3d at 1478 (quoting California v. Cabazon Bank of Mission Indians, 480 U.S. 202, 207 (1987) (other quotations omitted)), the extent of an Indian Tribe's authority to regulate nonmembers on a reservation, whether the source of that authority is based on treaty rights, acts of Congress, or inherent

tribal sovereignty, is manifestly a federal question. See National Farmers Union Ins. Cos. v. Crow Tribe, 471 U.S. 845, 852 (1985) ("The question whether an Indian tribe retains the power to compel a non-indian property owner to submit to the civil jurisdiction of a tribal court is one that must be answered by reference to federal law and is a 'federal question' under § 1331." (footnote omitted)); see also Brendale v. Confederated Yakima Indian Nation, 492 U.S. 408, 422-32 (1989) (plurality opinion) (analyzing

limitations on Indian Tribe's regulatory authority in light of United States treaties, federal statutes, and federal common law).

Because Baker's complaint necessarily presents a federal question, the district court had subject matter jurisdiction in the instant case. See 28 U.S.C. § 1331. Because the district court had subject matter jurisdiction, the complaint was properly removed to the district court. See 28 U.S.C. § 1441(b). Accordingly, the district court erred in remanding this matter back to the state court, and we reverse. See Gaming Corp., 88 F.3d at 542 ("A district court has no discretion to remand a claim that states a federal question.").[6]

## III.

Baker acknowledges that the district court has subject matter jurisdiction in this case. See Appellee's Br. at 21. Baker contends, however, that we should construe the district court's remand in this case as an

---

[6]We note that, beyond the jurisdictional grant of 28 U.S.C. § 1331, the district court may well have jurisdiction over this matter on the basis of diversity. See 28 U.S.C.A. § 1332 (West. Supp. 1997), 28 U.S.C. § 1441(b) (case may be removed to federal court where there is complete diversity of parties and amount in controversy exceeds $75,000); see also Appellee's Br. at 21 ("Baker would admit diversity jurisdiction to exist which would allow removal . . . ."). In addition, because the plaintiff's complaint is essentially an attempt to enforce a prior order of the district court, see Baker Br. in Opp'n to Mot. to Dismiss at 2 (May 3, 1996), reprinted in Appellant's App. at 101, the district court retained sufficient jurisdiction to ensure the effectiveness of its continuing order. See Picon v. Morris, 933 F.2d 660, 662 (8th Cir. 1991) ("When a court issues an injunction, it automatically retains jurisdiction to enforce it." (quotations, citation, and alterations omitted)).

exercise of abstention, and that we should affirm the district court's decision to abstain in this matter.

"[A]bstention is an extraordinary and narrow exception to the virtually unflagging obligation of federal courts to exercise the jurisdiction given them." In re Burns & Wilcox, Ltd., 54 F.3d 475, 477 (8th Cir. 1995) (quotations omitted). "Determining when to invoke this narrow exception involves considerations of federalism, comity, and judicial administration explored in the Supreme Court's many and varied abstention cases." Wolfson v. Mutual Benefit Life Ins. Co., 51 F.3d 141, 144 (8th Cir. 1995).[7]

The United States Supreme Court has identified several circumstances in which "the considerations of federalism, comity, and judicial administration . . . may justify overriding the strong presumption in favor of exercising federal jurisdiction." Wolfson, 51 F.3d at 145. Those branches of abstention relied on by Baker include Railroad Comm'n of Tex. v. Pullman Co., 312 U.S. 496 (1941) (federal court may abstain where controlling state law is unclear and a state court's clarification of state law could made a federal court's federal constitutional decision unnecessary); Younger v. Harris, 401 U.S. 37 (1971) (federal court must abstain from enjoining state court criminal proceedings); and Burford v. Sun Oil Co., 319 U.S. 315 (1943) (federal court may

---

[7]In Quackenbush v. Allstate Ins. Co., 116 S. Ct. 1712 (1996), the United States Supreme Court limited the holdings of both In re Burns & Wilcox and Wolfson on other grounds.  The Quackenbush Court disagreed with the In re Burns & Wilcox court's conclusion that abstention-based remand orders are not immediately appealable, see 116 S. Ct. at 1720, and modified the Wolfson Court's conclusion that Burford abstention is available in an action for damages.  See id. at 1728.

abstain in deference to complex state administrative procedure).

Baker's suit against Otter Tail raises important questions of federal law requiring interpretation of treaties, federal statutes, and the federal common law of inherent tribal sovereignty. Cf. Baker, 28 F.3d at 1476. Baker's suit does not, however, raise any issues of constitutional law. Accordingly, "Pullman abstention does not apply because no federal constitutional issues have been raised." In re Burns & Wilcox, 54 F.3d at

478.  Nor could the district court abstain from assuming jurisdiction over this matter on the basis of Younger. "Younger abstention is inapplicable in the absence of an ongoing state proceeding," id., and there is no ongoing state proceeding in the instant case.

Finally, we conclude that Burford abstention, although the most likely of the candidates offered by Baker, see id. ("Burford abstention applies when a state has established a complex regulatory scheme supervised by state courts and serving important state interests, and when resolution of the case demands specialized knowledge and the application of complicated state laws." (quotations and citations omitted)), is also inapplicable.  The premise of Burford abstention is that "a federal court should abstain when the action before it involves matters of state law best left to the state alone."  Middle South Energy, Inc. v. Arkansas Pub. Serv. Comm'n, 772 F.2d 404, 417 (8th Cir. 1985); see also Quackenbush, 116 S. Ct. at 1726 ("Ultimately, what is at stake is a federal court's decision, based on a careful consideration of the federal interests in retaining jurisdiction over the dispute and the competing concern for the independence of state action, that the State's interests are paramount and that a dispute would best be adjudicated in a state forum." (quotations and citation omitted)).

The question in the instant case is not what North Dakota's regulatory law requires, but whether "federal law . . . makes the proceeding or regulation at issue beyond the state's authority." Middle South, 772 F.2d at 417.  In this situation, "[t]here is no concern with protecting a legitimate state regulatory scheme, and the question becomes one of basic federal supremacy, which

does not turn on local factors or local expertise."  Id.
(citations omitted).  Accordingly, we do not believe that
there is any basis for construing the district court's
decision to remand for the lack of subject matter
jurisdiction as a decision to abstain.[8]

---

[8]In addition, the district court's dismissal of this matter for lack of subject matter jurisdiction is antithetical to a decision to abstain, which implicitly acknowledges the existence of jurisdiction.  See Colorado River Water Cons. Dist. v. United States, 424 U.S. 800, 813 (1976) (abstention is a decision of the district court to "decline to exercise or postpone the exercise of its jurisdiction" (quotations and citation omitted)).  We believe that the district court was capable of enunciating the basis of its decision to remand, and we do not choose to interpret the district court's holding contrary to the explicit terms of that holding.

## IV.

For the foregoing reasons, we reverse the district court's dismissal of this action for lack of subject matter jurisdiction.  We remand this matter back to the district court for a decision on the merits of Baker's complaint against Otter Tail.[9]

---

[9]In <u>Devils Lake</u>, the district court held that, while the Tribe did not have the exclusive authority to regulate the distribution of electricity on the Reservation, it did have exclusive authority to "determine who is to supply electrical service to Tribal owned businesses located upon Indian owned or trust lands . . . ."  896 F. Supp. at 961.  In a subsequent order, the district court declined to "extend the recognition of sovereign power to authorize the Tribe to regulate the provision of public utility type services to any usage by a tribal member upon tribally owned or trust lands."  Order at 2 (April 3, 1995), <u>reprinted in</u> Appellant's App. at 37.  The instant case presents the unsettled question of whether the Tribe, or North Dakota, has the authority to regulate the provision of electrical services to certain Tribal operations involving the delivery of governmental services.

In its decision dismissing this case, the district court stated, in "pure dicta," that "Baker is entitled to the protection it seeks."  Mem. Op. at 3 (July 9, 1996), <u>reprinted in</u> Appellant's App. at 115.  This statement seems at odds with the court's declaration in the same memorandum opinion that "Otter Tail may indeed be ultimately correct in the spin which it seeks to impart to the" district court's previous determination.  <u>Id.</u> at 2-3, <u>reprinted in</u> Appellant's App. at 114-15.  We presume that these contradictory statements were mere musings, and were not intended to telegraph a premature decision in this matter.  If we were similarly permitted to muse, also as a matter of pure dicta, we would note that the ability of an Indian Tribe to generate revenues is vital to Tribal interests--and thus an area of heightened sovereignty--because such revenues are necessary for the provision of Tribal services.  <u>Cf.</u> <u>Merrion v. Jicarilla Apache Tribe</u>, 455 U.S. 130, 137 (1982) ("The power to tax is an essential attribute of Indian sovereignty because it is a necessary instrument of self-government and territorial management.  The power enables a tribal government to raise revenues for its essential services.").  Baker's apparent argument that an Indian Tribe would have a greater sovereignty interest in exclusively regulating the provision of electrical services to a

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

Tribal business--which generates income which allows the distribution of Tribal services--than to a Tribal housing agency--which directly provides Tribal services--therefore strikes us as somewhat counterintuitive.